HARBOR SOFTWARE, INC., Plaintiff,

v.

APPLIED SYSTEMS, INC., Defendant.

No. 92 Civ. 8097 (HB).

United States District Court,
S.D. New York.

May 14, 1996.

Jeffrey C. Slade, Leventhal Slade & Krantz, New York City, for plaintiff.

Jeffrey D. Ullman, Ullman, Furhman, Platt & Koy, Morristown, NJ, for defendant.

## DECISION AND ORDER

BAER, District Judge:

Plaintiff, Harbor Software, Inc., brings this action for, *inter alia*, copyright infringement. Plaintiff alleges that defendant Applied Sys-

tems, Inc. infringed several of its copyrights in a computer program called the "Sales Center Manager" (SCM). SCM is designed to provide automated marketing services to insurance agencies. In brief, the program automates aspects of client development and management, such as direct mailing campaigns and client follow-up. The program also calculates various statistics that track client activity and business development. Plaintiff claims that several key elements of its program were copied by Applied Systems and incorporated into the defendants' competing product called "The Agency Manager."

This decision determines the nonliteral elements of SCM that are protectable under the Copyright Act, 17 U.S.C. § 101 et seq. For the reasons discussed below, certain elements represented in exhibits 4, 5, 6, 8, 9, 11, 12, 14, 25, and 28–36 are protectable.

## I. Discussion

■ To establish a claim of copyright infringement, a plaintiff must show both ownership of a valid copyright and that the defendant copied protectable elements of the copyrighted work. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 701 (2d Cir.1992). Copying may be shown either by direct or circumstantial evidence. Circumstantial evidence of copying consists of proof that the defendant had access to the copyrighted work and that the defendant's work is substantially similar to the copyrightable elements of the plaintiff's work. *Id.*

■ The Copyright Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. In addition to protecting the actual text of the program, i.e., the source or object code, the Act also protects nonliteral elements of a computer program. *Altai*, 982 F.2d at 702; *see also Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335 (5th Cir.1994), *opinion supplemented on denial of reh'g en banc*, 46 F.3d 408 (5th Cir.1995); *Gates Rub-ber Co. v. Bando Chem. Indus., Inc.*, 9 F.3d 823 (10th Cir.1993).

Although nonliteral aspects may be protectable, the scope of such protection will vary from case to case. The Act provides that:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b); *see also Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1879). In determining which nonliteral components of SCM are protectable, the Court must analyze the program and remove from consideration those elements that are excluded from copyright protection by § 102(b) and related doctrines of copyright law.

■ In *Altai*, the Second Circuit adopted a three-part test to weed out unprotectable elements of a computer program and determine substantial similarity. Under this analysis, the Court must first abstract the program, breaking it into its structural parts at varying levels of abstraction. *Altai*, 982 F.2d at 706. Next, the Court filters out those elements that are not protectable. *Id.* Finally, the Court compares the remaining protectable elements of the plaintiff's program to the defendant's work to determine if substantial similarity exists. *Id.*

To assist in this inquiry, the Court appointed David B. Hurry as the Court's expert pursuant to Fed.R.Evid. 706. Mr. Hurry has a bachelor's and master's degrees in electrical engineering and approximately twelve years of professional experience in various aspects of computer systems development. For the last ten years Mr. Hurry has been employed by the Department of Defense where he designs and builds large scale information processing systems, and is currently a systems engineer. I find Mr. Hurry fully qualified to act as a scientific expert in this case.

Mr. Hurry worked with the parties during the abstraction process to develop a series of exhibits that graphically represent the nonli-

teral elements of SCM for which the plaintiff seeks copyright protection. The claimed elements were described in detail in the plaintiff's filtration memorandum and thus the exhibits themselves do not constitute nonliteral aspects of the program. In addition, Mr. Hurry submitted a Report to the Court that detailed his recommendations as to the which elements of SCM were protectable.

This decision addresses the first two stages of the *Altai* analysis: abstraction and filtration. I determined that the filtration analysis is a matter of law for the Court, rather than for the jury. I based this decision on an analogy to the Federal Circuit's holding in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that interpretation of patent claims is an issue of law. Just as patent claims determine the boundaries of an inventor's monopoly, "filtration serves 'the purpose of defining the scope of plaintiff's copyright.'" *Altai*, 982 F.2d at 707 (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1475 (9th Cir.), *cert. denied*, 506 U.S. 869, 113 S.Ct. 198, 121 L.Ed.2d 141 (1992)). I find further support for my decision in the more broadly based unanimous decision by the Supreme Court affirming the Federal Circuit in *Markman. See* 506 U.S. at ——, ——, 116 S.Ct. at 1384, 1395 ("[J]udges, not juries, are ... better suited to find the acquired meaning of patent terms."); *id.* at ——, 116 S.Ct. at 1396 ("Uniformity would, however, be ill served by submitting issues of document construction to juries."); *see also Lotus Dev. Corp. v. Borland Int'l, Inc.*, 788 F.Supp. 78, 94–96 (D.Mass.1992).

This decision came about as the result of a two-day bench trial held on April 23 and 26, 1996 at which Mr. Hurry was cross-examined on his Report and witnesses were examined and cross-examined by the parties. The next stage in this bifurcated copyright litigation will be motions for summary judgment and a jury trial on the comparison of nonliteral elements found to be protectable expression.

I based my conclusions on Mr. Hurry's Report, the exhibits themselves, the evidence presented and arguments made at the bench trial, the parties' extensive submissions, and the arguments made at a hearing held on February 16, 1996. As to the legal issue of protectability, Mr. Hurry's recommendations and the additional expert testimony was considered as relevant to the ultimate issue, *see* Fed.R.Evid. 704, but all legal determinations were made *de novo* after full consideration of the evidence presented and arguments made by the parties.

### A. Abstraction

In *Altai*, the Second Circuit defined the abstraction process as a method of theoretically dissecting the plaintiff's code. The Court retraces the programmer's steps in reverse order moving from code through modular organization and the function of modules to the program's main purpose. *Altai*, 982 F.2d at 707. The aim is to identify those structural elements, such as "general flow charts as well as the more specific organization of inter modular relationships, parameter lists, and macros," that may be protectable. *Id.* at 702.

The Tenth Circuit expanded on this definition of a program's structure and identified several additional elements that may constitute protectable expression. *See Gates Rubber*, 9 F.3d at 835. The court in *Gates Rubber* noted that "a computer program can often be parsed into at least six levels of generally declining abstraction: (i) the main purpose, (ii) the program structure or architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code." *Id.* This analysis builds on *Altai*'s emphasis on modular structure and inter module relationships to include the concepts of control flow, data flow and modular nesting. As the Tenth Circuit found:

Control flow is the sequence in which the modules perform their respective tasks. Data flow describes the movement of information through the program and the sequence with which it is operated on by the modules. Substructure or nesting describes the inner structure of a module whereby one module is subsumed within

another and performs part of the second module's task.

*Id.* (citations omitted).

As noted previously, the plaintiff produced a series of exhibits that describe the nonliteral elements of SCM for which it claims copyright protection. In creating the exhibits, plaintiff began at the architectural level of abstraction and roughly followed one or another of the levels of abstraction as set forth in the *Gates Rubber* analysis discussed above. The subsequent exhibits include increasing amounts of detail and thus become decreasingly abstract.

■ During the abstraction process, several fundamental disputes arose between the parties. First, Applied Systems objects to the definition of a module that plaintiff used in its abstraction exhibits. According to Mr. Hurry, the traditional definition of a module is a section of code designed to perform a discrete function or series of functions that has a defined entry and exit point. In abstracting SCM, plaintiff did not adhere to this definition of a module. Rather, plaintiff focussed on the functional aspects of its code. The plaintiff treated a module as all code that functions together as if it were one discrete unit. Thus several exhibits weave in and out of formal modules in the order in which they are executed by the program.

The defendant claims that *Altai* focusses on modular structure and thus requires that an abstraction conform to Mr. Hurry's traditional definition of a module. *Altai*, however, discussed not only modular structure but also the inter-relationships between modules. These relationships can also be classified as control flow and data flow. Thus plaintiff has focussed on the data flow and control flow of its program rather than its strict modular structure. Although possibly unconventional in the computer industry, as discussed above, these structural elements may be protectable if they pass filtration. *See Gates Rubber*, 9 F.3d at 835. Accordingly, defendant's objection is rejected.

■ Plaintiff also claims protection for the selection, arrangement and sequence of its program by invoking the compilation doctrine. The Copyright Act defines a compilation as

> a work formed by the collection and assembling of preexisting materials or data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. § 101. A compilation may be protected "if it features an original selection or arrangement." *Feist*, 499 U.S. at 350, 111 S.Ct. at 1290. This requirement is satisfied where the work was "independently created by the author ... and ... possesses at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. at 1287. Plaintiff argues that several elements of SCM constitute both independently protectable expression and, in combination with other, possibly unprotectable elements, are protectable as a compilation. Strictly speaking, though, the plaintiff's program cannot be viewed as a compilation because SCM does not consist solely of "preexisting material or data."

■ Plaintiff's analogy to the compilation doctrine, however, is sound. Several courts have looked to the Supreme Court's opinion on the compilation doctrine in *Feist*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), for guidance in determining whether nonliteral elements of a computer program are protectable and the scope of such protection. *See Altai*, 982 F.2d at 711–12; *Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 536 n. 20 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994). In addition, the concepts of selection, arrangement and organization, central to the compilation doctrine, *see Feist*, are included in the analysis of a computer program's structure. *See Engineering Dynamics*, 26 F.3d at 1341 (holding that nonliteral elements "such as the program architecture, 'structure, sequence and organization,' operational modules, and computer-user interface" may be protectable); *id.* at 1346 (applying *Feist's* definition of originality to user input and output formats). I note, however, that the protection afforded compilations is thin and extends only to the expression contained in the selection, arrangement or sequence of the program's

structural elements that are not otherwise independently protectable. *See Feist,* 499 U.S. at 349, 358–59, 111 S.Ct. at 1294–95; *Key Publications, Inc. v. Chinatown Today Pub. Enter., Inc.,* 945 F.2d 509, 512–14 (2d Cir.1991).

■ Finally, defendant challenges certain exhibits as duplicative. Plaintiff has in several instances claimed protection for individual sequences within an exhibit both as part of a larger exhibit and as an independent exhibit. Plaintiff may maintain the duplicative exhibits. At the comparison stage, the jury instructions will make clear that duplicative sequences may not be counted twice in determining substantial similarity. The substantial similarity analysis looks to whether the defendant copied the protectable elements of plaintiff's work and whether those copied elements were an important aspect, qualitatively speaking, of the plaintiff's overall work. *See Altai,* 982 F.2d at 710–11; *Gates Rubber,* 9 F.3d at 838–39. The jury will be instructed that a particular expression cannot be considered significant simply because it was included in two separate exhibits.

### B. Filtration

■ The central focus here is the filtration analysis under *Altai:*

This process entails examining the structural components at each level of abstraction to determine whether their particular inclusion at that level was "idea" or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea; required by factors external to the program itself; or taken from the public domain and hence is nonprotectable expression.

*Altai,* 982 F.2d at 707. In explaining this process, the Second Circuit noted that it was drawing on established doctrines of copyright law, such as merger and *scenes a faire. Id.* at 707–09. Merger occurs when there is only one way to express an idea, and thus to grant protection to the expression would impermissibly grant a monopoly over the underlying idea. *Id.* at 707–08 (citing *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1st Cir.1988)). In applying the merger doctrine, the Court must also consider whether the expression contained in a particular structural element has merged with the process that the program is performing. *See Gates Rubber,* 9 F.3d at 836–37; *id.* at 844–45 (remanding for determination of whether engineering module merged with process of algorithm expressed in module). The *scenes a faire* doctrine, and the closely related public domain rule, deny protection to stock devices that are either standard expressions within a particular industry or are standard programming techniques. *Id.* at 709–10. As described in *Altai,* filtration involves a fact specific analysis that is necessarily *ad hoc. Altai,* 982 F.2d at 704, 707. I examine the exhibits in turn.

#### *Exhibits 1, 3, 7, 10, 13, 17, 20, 22, 23*

Each of these exhibits has been withdrawn by the plaintiff or consolidated into other exhibits. Accordingly, no filtration analysis is required.

#### *Exhibit 2*

■ This exhibit is entitled Program Architecture Level: Structure and Data Flow. It is the highest level of abstraction of SCM for which plaintiff seeks protection and consists of a group of circles and cylinders connected by arrows as well as annotations describing the relationships that the connecting arrows indicate. Mr. Hurry recommended in his Report that this exhibit should be excluded because the links between the exhibit and the code were so ambiguous as to make an evaluation of the exhibit's technical accuracy impossible. In addition, Mr. Hurry expressed his belief that exhibit 2 is so abstract that the expression contained in it merges with the idea of creating a computer program to automate marketing.

I find this exhibit is not protectable. At this high level of abstraction, the idea and expression have merged. Insufficient alternatives exist for programmers to create expressions at lower levels that would not appear to be identical at this level of abstraction.

#### *Exhibit 4*

■ Exhibit 4 is entitled Module Level: Data Flow and Control Flow for Automated Prospecting. Like exhibit 2, exhibit 4 is a

highly abstract chart with annotations describing particular relationships between structural elements. Mr. Hurry recommended in his Report that this exhibit be excluded, although he testified that he did not consider the annotations that had been recently added. Mr. Hurry found that this exhibit was not sufficiently connected to the code and utilized some common programming techniques constituting *scenes a faire*. Furthermore, Mr. Hurry reported that this exhibit represents no more than a description of the process that the module performs, i.e., initiate plan, perform plan, and complete plan. Thus, the expression and process have merged.

Despite this testimony by Mr. Hurry, plaintiff presented several persuasive arguments as to why the exhibit reflects protectable expression. Much of Mr. Hurry's analysis focused on the control flow aspects of exhibit 4. I agree that the control flow has merged with the process of automated prospecting. However, the data flow relationships reflected in the exhibit represent protectable expression. The programmer made a series of choices in deciding how the information processed in the module progresses through the program for the purpose of effectuating automated prospecting. In addition, the necessary data is stored in particular files that were structured by the programmer. These choices are not the only relationships possible; sufficient alternatives exist to preclude a finding of merger.

*Exhibit 5*

▇▇ Exhibit 5 is entitled Plain Language Level: Control and Data Flow for Initiating a Prospect or Client on a Marketing Plan. This exhibit is the first conventional flow chart. It also contains sequences that duplicate material included in exhibit 18. As discussed below, however, the expression in this sequence has merged with the process described. Accordingly, this section must be removed from the exhibit.

Mr. Hurry both recommended in his Report and testified that the remaining elements are protectable if properly modified by plaintiff more accurately to reflect the code. I agree with Mr. Hurry's analysis that the

top portion of exhibit 5 includes protectable expression. This portion of the exhibit reflects the programmer's expressive choices made in structuring the process by which a user initiates a marketing plan. Many alternatives exist and this arrangement is neither dictated by external considerations nor taken from the public domain. Furthermore, unlike the bottom portion, once modified, the top section of exhibit 5 will not merely describe the user process of initiating a marketing plan, and thus will not merge with that process. Accordingly, plaintiff is granted until May 24 to modify exhibit 5 in conformance with Mr. Hurry's testimony.

*Exhibit 6*

▇▇ Exhibit 6 is entitled Selected Database Files for SCM. In this exhibit plaintiff claims protection for the data structures it created in the SCM program to store and manipulate input from the user. Defendant challenges this exhibit on many grounds. Most importantly, defendant claims that the list of claimed fields is incomplete. Defendant argues that for plaintiff to obtain protection for the fields within a database file it must include every field in its claim. Omissions, defendant contends, distort the exhibit. Mr. Hurry agrees with defendant that technical accuracy requires completeness.

I conclude that the selection and organization of the database fields as expressed in exhibit 6 are protectable. *See CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 337, 354 (M.D.Ga.1992). Nothing dictates the particular groupings of these fields within the various database files. While many of these fields may store standard information used in the insurance industry, no evidence suggests that the selection and organization of the database fields within SCM is required.

I also reject defendant's argument that completeness is required at the filtration stage. As discussed above, the substantial similarity inquiry looks to the relative importance of the protectable elements within the plaintiff's code. Thus defendant will be free to argue that the selection and organization of the fields claimed in exhibit 6 form such an insignificant portion of plaintiff's database

files that no substantial similarity can be found.[1]

### Exhibit 8

■ Exhibit 8 is entitled Plain Language Level: Data Flow and Control Flow for Self–Administered Marketing Module. This exhibit is a high level abstraction similar to exhibit 4. Mr. Hurry recommended in his Report against protection of this exhibit on three grounds. First, he believed that the lack of an entry and exit point for the abstraction makes an assessment of technical accuracy impossible. Second, he believed the abstraction contained insufficient detail to convey the expressive choices made by the programmer. Finally, he believed that the annotations changed the level of abstraction and should be ignored.

As to the first point, plaintiff correctly notes that this failure should not preclude protection of elements that are within the module. As to Mr. Hurry's other points, I find that the annotations may be considered and when they are, the exhibit reflects protectable expression. The relationships between the modules and database files described in exhibit 8 are not dictated by considerations of efficiency or external limitations. In addition, plaintiff has demonstrated that sufficient alternative expressions exist such that there is no merger.

### Exhibit 9

■ Exhibit 9 is entitled Plain Language Level: Source Code Description Part of IES-CAN.PRG; Action Possibility: Queuing the Next Letter and Adding an Activity Record in an Automated Marketing Plan and is excerpted from exhibit 14. Mr. Hurry recommended in his Report and testified that exhibit 9 represented protectable expression that was not found in the public domain. In addition, plaintiff has demonstrated that sufficient viable alternatives exist such that the expression has not merged with the underlying idea of the exhibit. Therefore, this exhibit survives filtration.

### Exhibits 11, 12

Exhibit 11 is entitled Plain Language Level: Source Code Description Part of IES-CAN.PRG; Action Possibility: Closing Activity. Exhibit 12 is entitled Plain Language Level: Source Code Description Part of IES-CAN.PRG; Action Possibility: Exceptions Processing. These two exhibits are excerpted from exhibit 14 and both contain the same initial sequence, boxes 13–15, 52, 52b. They differ with respect to the bottom third of the exhibit that reflects the sequence of steps the program takes in response to user input at box 52b. Mr. Hurry recommended in his Report that these exhibits be excluded. However, in his testimony, Mr. Hurry clarified his position when he stated that boxes 13–15 reflected protectable expression. Plaintiff has demonstrated that taken as a whole, these exhibits are protectable.

### Exhibit 14

Exhibit 14 is entitled Plain Language Level: Description of the Source Code for Self–Administering Marketing Module (IES-CAN.prg). Defendant concedes that in its entirety, this exhibit contains protectable expression. The selection, organization and structure of the elements represented in exhibit 14 are therefore held to be protectable.

■ The parties dispute, however, whether particular sequences within the larger flow chart are protectable. Plaintiff's exhibit 38 details the individual elements for which protection is claimed. In his Report, Mr. Hurry stated that the individual elements are unprotectable. However, in his testimony, Mr. Hurry had an opportunity to rethink several items. First, with respect to boxes 4, 15, and 29, Mr. Hurry concluded they were not common programming techniques found in the public domain. Plaintiff's filtration argument demonstrates the expressive choices made in designing these elements. Accordingly, they pass filtration and are protectable. Mr. Hurry testified, however, that the other individual boxes for which protection was claimed in exhibit 14 were found in the public domain and thus were not protectable.

---

**1.** I note that defendant has objected to several exhibits on the basis that essential elements were omitted. Plaintiff responds generally that it only needs to abstract those elements for which it seeks protection, rather than the complete program. As discussed with respect to exhibit 6, defendant may raise these objections to other exhibits at the comparison stage.

Mr. Hurry also testified that boxes 13–15, 22–24 and 48–51 constituted protectable expression, as does the organization of the three searches represented by boxes 11–12, 17–19 and 26–28. I conclude that these elements do represent expressive choices made by the programmer that were not dictated by efficiency or external factors or taken from the public domain. They are protectable nonliteral elements of SCM.

■■■ The sequence of boxes 11–12 is also protectable. Mr. Hurry testified that these boxes represented the idea of performing the type of search indicated. However, plaintiff correctly argues that the idea cannot be formulated at such a low level of abstraction. *See Kregos v. Associated Press,* 937 F.2d 700, 706 (2d Cir.1991). I conclude that the idea underlying this section of exhibit 14 is to design a series of searches to perform automated marketing tasks. The particular structure of the searches is an expression of that idea. The idea and expression do not merge.

■■■ The issue of whether the process and expression merge is closer, however. A programmer should not have a monopoly over the design of a search if that is the only possible design. This would violate § 102(b) as it would grant protection to the process of a particular search. However, I conclude that sufficient alternatives exist here.

Decision is reserved as to the remaining claims as to individual elements of exhibit 14 that are discussed in exhibit 38 and not addressed here.

*Exhibits 15, 16, 16b*

■■■ Exhibits 15, 16 and 16b reflect file-locking features of SCM. These features are intended to block access to a database file when it is in use so that two users do not modify the same file at the same time. Mr. Hurry both recommended in his Report and testified that these exhibits be excluded. He believed that these file locking steps are contained in computer programming books and therefore constitute standard techniques found in every database program. I find that these elements are found in the public domain. In addition, the idea underlying these exhibits is to lock files that are in use.

I conclude that the expression reflected in these exhibits merges with this idea. Accordingly, these exhibits are not protectable.

*Exhibits 18 and 21*

Exhibit 18 is entitled Plain Language Level: Data Flow and Control Flow for Searching an Individual Prospect/Client and Modifying Prospect/Client Information. Exhibit 21 has been largely subsumed by exhibit 18. Mr. Hurry recommended in his Report, and I agree, that the only separate elements describe methods of operations and are nonprotectable.

■■■ Exhibit 18 is a flow chart that reflects the section of code which permits a user to interact with the program and search and modify prospective and current client information. Many of the boxes in the flow chart reflect that the program "get[s] input" for a particular variable. Mr. Hurry recommended in his Report that exhibit 18 was protectable expression, but at the hearing voiced the thought that the expression merged with the user process described, thus precluding protection under the Copyright Act. I agree. As demonstrated by defendant, an abstraction of the process of receiving the user input would be identical to the flow chart reflecting SCM. At this level of abstraction, which admittedly is quite low, the process of receiving user input merges with the plaintiff's expression of that process in the code.

*Exhibits 19 and 24*

These exhibits consist of flow charts reflecting a plain level description of entering the prospect data and performing searches on the prospect/client file. For the reasons discussed with respect to exhibit 18, I conclude that the expression reflected in exhibits 19 and 24 has merged with the process described. Thus they are not protectable.

*Exhibits 27 and 28*

■■■ These two exhibits reflect the program structures designed to calculate cyclic statistics. Exhibit 27 is entitled Plain Language Level: Data Flow and Control Flow for Cyclic Statistics. Exhibit 28 is entitled Plain Language Level: Source Code De-

scription for the Cyclic Statistical Tracking Program. Mr. Hurry recommended both in his Report and his testimony that exhibit 27 is unprotectable while exhibit 28 is protectable.

Essentially, Mr. Hurry found that exhibit 27 described the method of calculating cyclical statistics. The expression of this method merged with the algorithm itself. Accordingly, this process of calculation is excluded from copyright protection under § 102(b). Exhibit 28, on the other hand, is a flow chart that conveys the expressive choices made by the programmer as to the particular steps taken in calculating cyclical statistics. While this exhibit is close to the merger line, Mr. Hurry found that alternative formulations exist as to the sequence and organization of the program. I agree with these factual recommendations and conclude that exhibit 28 is protectable.

In his Report, Mr. Hurry recommended that the subset of exhibit 28 which is described in exhibit 38 and for which protection was claimed was unprotectable. Mr. Hurry rethought that conclusion in his testimony, however, where he stated that this section was independently protectable. I too conclude that this subset is protectable.

*Exhibits 25, 29–36*

■ These nine exhibits consist of reports and screen displays generated by the program. Applied Systems argues that these are not nonliteral elements of the code because they have no relationship to the code. Rather, they are products of the code and thus are not protected by the copyright of the code. This argument misconstrues the law. A copyright registration of the code extends to the screen displays, and thus the reports are protectable to the extent that they contain copyrightable expression. *See Napoli v. Sears, Roebuck & Co.,* 874 F.Supp. 206, 211 (N.D.Ill.1995); *Manufacturers Technologies, Inc. v. Cams, Inc.,* 706 F.Supp. 984, 991–93 (D.Conn.1989); *cf. Engineering Dynamics,* 26 F.3d 1335 (holding input and output formats may be protectable). Thus, each exhibit must be analyzed as any other nonliteral element to filter out nonprotectable elements.

■ Plaintiff seeks to protect only the selection and arrangement of the information included in its screen reports and displays as a compilation. While the record on this issue is sparse, I conclude that sufficient expressive choices were made in the selection and arrangement of the elements in each exhibit to satisfy the minimal requirement of originality and warrant protection. *Cf. Kregos v. Associated Press,* 937 F.2d 700 (2d Cir.1991).

## II. Scheduling Issues

At the April 26 hearing several dates were agreed to by the parties and the Court regarding discovery and motions for summary judgment. I have modified them slightly to reflect the date of this decision and order.

The plaintiff must provide defendant with an updated, technically accurate version of exhibit 5 that conforms to Mr. Hurry's recommendation by May 24, 1996. The plaintiff must also provide the defendant with a detailed list of the sections of the defendant's code that are alleged to be infringing by that date. Finally, the plaintiff must designate a damages expert and provide defendant with the expert's report by July 1, 1996. Failure to comply with these deadlines will result in preclusion of the evidence at trial pursuant to Fed.R.Civ.P. 37.

The defendant may file a motion for summary judgment on or before June 14, 1996. The plaintiff's opposition papers must be filed on or before June 21, 1996. Any reply from the defendant must be filed on or before June 25, 1996.

## III. Conclusion

Several nonliteral elements of SCM represent protectable expression and thus pass the filtration analysis mandated by the *Altai* decision. Those elements deemed protectable will proceed to the comparison stage. This constitutes the Decision and Order of the Court.